**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

ANTHONY Z. EMMANOUIL, ET AL.,

Plaintiffs,

v.

VINCENT V. ROGGIO, ET AL.,

Defendants.

VINCENT ROGGIO,

Plaintiff,

v.

ANTHONY Z. EMMANOUIL, ET AL.,

Defendants.

Civ. No. 06-1068 (GEB)

**MEMORANDUM OPINION**

**BROWN, Chief Judge**

This matter comes before the Court upon: (1) the motion for partial summary judgment filed by Anthony Z. Emmanouil, Eugenial K. Emmanouil, and West Belt Auto Supply, Inc. (collectively the "Emmanouils"); and (2) the motion for partial summary judgment filed by Vincent Roggio, Callie Lasch Roggio, and Noved Real Estate Corp. (collectively the "Roggios").[1] (Doc. Nos. 153, 154.) Each motion is opposed. (Doc. Nos. 159, 161.) The Court

[1] Throughout this memorandum opinion the Court will not label any party "plaintiff" or "defendant" because, as the caption indicates, both the Emmanouils and the Roggios have filed amended complaints in this consolidated case that lodge multiple causes of action against each other based upon a common factual background. (Doc. Nos. 33, 139.)

has considered the parties' submissions without oral argument pursuant to Federal Rule of Civil Procedure 78. Having done so, the Court will deny the Emmanouils' motion and grant in part and deny in part the Roggios' motion for the reasons that follow.

## I. BACKGROUND

### A. Facts

At issue in this complex case are three sets of interrelated transactions that primarily involve Anthony Emmanouil ("Anthony"), Vincent Roggio ("Roggio"), and West Belt Auto Supply, Inc. ("West Belt"). For the sake of clarity, the Court will discuss the facts surrounding each set of transactions separately.

The first set of transactions relates to the ownership of West Belt, which is located in Houston, Texas, and was established in 1976. (Emmanouil 56.1 at ¶ 1; Roggio Resp. at ¶ 1; Doc. Nos. 153, 161: Emmanouil Decl. Ex. 1; Doc. No. 153-4.) Anthony became sole owner of West Belt in 1985. (Emmanouil 56.1 at ¶ 2; Roggio Resp. at ¶ 2; Doc. Nos. 153, 161.) Anthony met Roggio in approximately October, 2001, through Anthony's son, Zachary Emmanouil ("Zachary").[2] (*Id.* at ¶ 3.) At the time Anthony and Roggio met, Anthony owned the real property where West Belt conducted business free and clear of any mortgages or encumbrances. (*Id.* at ¶ 4.) In approximately January, 2002, Anthony approached Roggio in connection with

[2] Zachary is a central figure in this litigation. Despite that, Zachary was dismissed as a party to this case on October 10, 2006, because of his then-pending bankruptcy petition. (Doc. No. 23.) As a result, Roggio's operative pleading makes no claims against Zachary directly. (Doc. No. 139.) The Court notes that on August 14, 2009, Roggio filed a motion to amend/correct pleadings. (Doc. No. 176.) Roggio's proposed amended complaint contained renewed causes of action against Zachary. (*Id.*) Roggio's motion to amend/correct pleadings, however, was denied by the Court on November 25, 2009. (GEB 11/25/09 Mem. Op. & Order; Docs. No. 195, 196.)

finding a broker to sell West Belt. (*Id.* at ¶ 5.) Roggio was provided with certain information regarding West Belt and thereafter Roggio traveled to West Belt's place of business in Houston, Texas and inspected the premises. (*Id.* at ¶¶ 6, 7.) Subsequently, on April 15, 2002, Anthony and Roggio signed a document (the "Contract") that stated the following:

> <u>CONTRACT</u>
>
> This Contract is entered by and between Anthony Z. Emmanouil ("Seller"), whose address is 10015 Locke Lane, Houston, Texas, 77042, and Vincent Roggio ("Buyer") whose address is 457 Navesink River, Red Bank, New Jersey, 07701, whereby Seller agrees to sell, and Buyer agrees to buy, 90% of West Belt Auto Supply, Inc. d/b/a West Best Firestone ("Property"), located at 10402 Valley Forge, Houston, Texas, 77-42, including the property, business, inventory, equipment, and vehicles, in consideration of $1,350,000.00 paid pursuant to the following terms and conditions:
>
> 1. $650,000 cash will be paid by Buyer to Seller as a down payment at the date of closing, of which a $250,000.00 good faith deposit has already been received by Seller on April 15, 2002 and held in trust by Zachary A. Emmanouil, Esq., attorney at law. The $250,000.00 shall be paid to Seller at the date of closing.
>
> 2. The remaining $400,000.00 from the initial $650,000.00 down payment will be paid by Buyer to Seller at the date of closing.
>
> 3. $400,000.00 shall be paid by Buyer to Seller over the course of a seven year period upon an unsecured balloon note executed by Buyers in favor of Seller at the rate of 4% per annum.
>
> 4. 30 shares of Noved Real Estate Corp. Stock, valued at $300,000.00 shall be paid [remainder illegible]
>
> 5. Neither Buyer or Seller will encumber the Property above and beyond the first mortgage of $670,000.00.
>
> /s/ Anthony Z. Emmanouil
> Seller

/s/ Vincent Roggio
Buyer

(Emmanouil Decl. Ex. 1; Doc. No. 153-4.) Several months after the Contract was signed, on August 10, 2002, Anthony executed a document that transferred all managerial authority of West Belt to Leonard Jones ("Jones").[3] (Emmanouil Decl. Ex. 2; Doc. No. 153-4.) Roggio had asked Jones to come to Houston and help grow West Belt's used car sales business. (Emmanouil 56.1 at ¶ 14; Roggio Resp. at ¶ 14: Doc. Nos. 153, 161.)

On September 27, 2002, Central Bank approved a $750,000.00 loan to West Belt. (*Id.* at ¶ 18.) That loan was secured by a "first lien Deed of Trust on the subject property" and was guaranteed by Vincent Roggio. (Emmanouil Decl. Ex. 5; Doc. No. 153-4.) A short time later, on October 15, 2002, Anthony executed a document that stated the following:

**WEST BELT AUTO SUPPLY, INC.**
**d/b/a**
**WEST BELT FIRESTONE**

**WRITTEN CONSENT OF SOLE SHAREHOLDER AND MEMBER OF THE BOARD OF DIRECTORS**

**Dated as of October 15, 2002**

The undersigned, being the sole shareholder and Member of the Board of Directors of West Belt Auto Supply, Inc., d/b/a West Belt Firestone, a Texas Corporation (the "Company"), pursuant to the provisions of the laws of the State of Texas, does hereby agree and consent that when this consent or an exact counterpart hereof, each of which counterparts when taken together

[3] Mr. Jones was a cell mate of Roggio's when both were previously incarcerated. (Emmanouil 56.1 at ¶ 13; Roggio Resp. at ¶ 13: Doc. Nos. 153, 161.) Roggio was incarcerated after a 1987 jury conviction for mail fraud in federal district court. (Roggio Decl. at ¶ 4; Doc. No. 161-2.) Roggio stated that Jones was incarcerated for bank robbery. (Modugno Decl. Ex. A. at p. 182; Doc. No. 153-6.)

shall constitute but one and only one consent, is signed, the resolutions set forth below shall be deemed to have been adopted to the same extent and to have the same force and effect as if adopted at a formal meeting of the Company's Board of Directors duly called and held for the purpose of acting upon proposals to adopts such resolutions.

**Transfer of Interest.**

**WHEREAS**, Anthony Z. Emmanouil is the sole shareholder and member of the Company;

**WHEREAS**, the Board of Directors seeks to expand the Company;

**WHEREAS**, the Board of Directors believes that Vincent Roggio is the person best suited to expand the Company;

**RESOLVED**, that the Board of Directors hereby transfers a 90% interest of the business of the Company, and an 80% interest of the real property of the Company, to Vincent Roggio in exchange for good, valuable, and other adequate and sufficient consideration which has already been received by the Board of Directors from Vincent Roggio.

**General Ratification**

**RESOLVED**, that in addition to and without limiting the foregoing, the appropriate managers of the Company be, and hereby are, authorized to take, or cause to be taken, such further action, and to execute and deliver, or cause to be delivered, for and in the name on behalf of the Company, all such instruments and documents as the managers may deem appropriate in order to effect the intent of the foregoing resolutions (as conclusively evidenced by the taking of such action or the execution and delivery of such instruments, as the case may be), and that all actions heretofore taken by the managers and agents of the Company in connection with the subject of the foregoing recitals and resolutions be, and hereby are, approved, ratified, and confirmed in all respected as the acts and deeds of the company.

**IN WITNESS WHEREOF,** the undersigned sole shareholder and member of the Company has duly executed this consent as of October 15, 2002.

        /s/ Anthony Z. Emmanouil

(Emmanouil Decl. Ex. 52; Doc. No. 153-4.) Shortly after this document was executed, on October 22, 2002, West Belt and Central Bank closed on the $750,000.00 loan. (Emmanouil 56.1 at ¶ 14; Roggio Resp. at ¶ 14; Emmanouil Decl. Ex. 6: Doc. Nos. 153, 161.) Also on October 22, 2002, and in connection with the aforementioned loan, Roggio executed on behalf of West Belt a Promissory Note to Central Bank in the amount of $750,000.00, and granted to Central Bank a Deed of Trust and Security Agreement on the West Belt property. (Emmanouil Decl. Ex. 6, 7; Doc. No. 153-4.) The loan was guaranteed by Victor Roggio. (Emmanouil Decl. Ex. 5; Doc. No. 153-4.)

It is undisputed that on October 22, 2002, when the Central bank loan closed, Roggio had sole control of West Belt and had the authority to direct how the $750,000.00 proceeds of that loan should be disbursed. (Roggio 56.1 at ¶ 27; Emmanouil Resp. at ¶ 27: Doc. Nos. 154, 159.) Of the $750,000.00 funded to West Belt by Central Bank on October 22, 2002, $503,524.30 was immediately used to pay off prior loans to West Belt from Sterling Bank that had been obtained by Anthony. (Emmanouil 56.1 at ¶ 21; Roggio Resp. at ¶ 21: Doc. Nos. 153, 161.) $214,753.50 in cash was provided to West Belt.[4] (*Id.* at ¶ 22.) On October 23, 2002, the day after the Central Bank loan closed, West Belt wrote checks for $200,000 and $14,000 payable to Noved Real Estate Corp. ("Noved"), a company owned by Roggio. (*Id.* at ¶¶ 23, 24, 26.) In addition, West Belt also wrote checks payable to Noved for $37,500 and $18,500 on August 14, and September 11, 2002, respectively. (*Id.* at ¶¶ 32, 33.) Roggio states that between October 22, 2002 and

[4] The Court notes that the parties submissions fail to account for the total $750,000.00 funded by Central Bank on October 22, 2002 ($503,524.30 + $214,753.5 = $718,277.80). The parties, however, do not apparently dispute the $31,722.20 shortfall.

December 11, 2005, he was the only person with access and control over Noved's bank account and funds. (*Id.* at ¶ 25.) The parties agree that, prior to October 22, 2002, Roggio had loaned a "considerable" amount of money to West Belt to pay for on-site improvements. (Roggio 56.1 at ¶ 16; Emmanouil Resp. at ¶ 16: Doc. Nos. 154, 159.) The amount West Belt owed Roggio is disputed, but Roggio asserts that as of June 30, 2004, West Belt owed Roggio $359,941. (*Id.* at ¶ 17.)

In or about mid-2004, Roggio found that West Belt was not generating sufficient income to meet its liabilities, and decided the used car business should be closed and the real estate sold. (*Id.* at 32.) On October 22, 2004, after that decision was made and following negotiations, West Belt and Kenex Corporation, doing business as Meineke Car Care Centers, entered into a lease purchase agreement, entitled the "Meineke Lease Purchase Agreement." (Emmanouil 56.1 at ¶ 34; Roggio Resp. at ¶ 34; Emmanouil Decl. Ex. 47: Doc. Nos. 153, 161.) Pursuant to the Meineke Lease Purchase Agreement, Kenex agreed to pay West belt $25,000 immediately, and $150,000 not later than November 15, 2004. (*Id.* at ¶ 35.) Roggio denies the Emmanouils' assertion that Roggio or a company Roggio controlled received from West Belt the aggregate $175,000 Kenex paid West Belt. (*Id.* at ¶ 36.) Roggio admits, however, that in sum, the funds received by or on behalf of Roggio from West Belt between August, 2002, and November, 2004, total $445,000, comprised of the following individual transfers: (1) $37,500 on August 14, 2002; (2) $18,500 on September 11, 2002; (3) $200,000 on October 23, 2002; (4) $14,000 on October 23, 2002; and (5) $175,000 in October and November, 2004. (Emmanouil 56.1 at ¶ 38; Roggio Resp. at ¶ 38; Emmanouil Decl. Ex. 3, 13, 11, 12, 50, 51: Doc. Nos. 153, 161.)

Shortly before the Meineke Lease Purchase Agreement with Kenex was executed, Central

Bank accelerated the $750,000 loan on October 7, 2004.  (Emmanouil 56.1 at ¶ 21; Roggio Resp. at ¶ 28: Doc. Nos. 153, 161.)  On August 1, 2005, however, Central Bank and Roggio agreed to reinstate the loan, which at that time had an unpaid principal balance of $699,553.61.  (Emmanouil Decl. Ex. 45, sub B; Doc. No. 153-4.)  In doing so, Central Bank stated that the loan was secured by the Deed of Trust on West Belt's real property, an assignment of rents and leases on the property, and Vincent Roggio's personal guarantee.  (*Id.* at sub. C, D.)

On December 12, 2005, Anthony and Zachary Emmanouil executed a document on behalf of West Belt Auto Supply, Inc. entitled "UNANIMOUS CONSENT OF THE SOLE SHAREHOLDER TO REMOVE VINCENT ROGGIO AS A MEMBER OF THE BOARD AND DENNIS ROGGIO AS OFFICER AND DIRECTOR."  (Emmanouil Decl. Ex. 51; Doc. No. 153-4.)  In this document, Anthony and Zachary purport to remove Roggio and his cousin from their official positions, but expressly resolve that Roggio is personally liable to satisfy myriad outstanding debts, including the October 22, 2002 loan from Central Bank.  (*Id.*)

Ultimately, in August, 2007, Central Bank advised West Belt that it was not willing to extend the maturity of the October 22, 2002 loan beyond October, 2007.  (Emmanouil 56.1 at ¶ 29; Roggio Resp. at ¶ 29: Doc. Nos. 153, 161.)  In response, Anthony arranged a $686,000 personal loan from Mr. John Siakotos to pay off the remaining balance on the Central Bank loan.  (Emmanouil 56.1 at ¶ 30; Roggio Resp. at ¶ 30; Emmanouil Decl. Ex. 46: Doc. Nos. 153, 161.)  The loan from Mr. Siakotos is secured by a first mortgage on the West Belt Property.  (*Id.* at ¶ 31.)

The second set of transactions at issue relates to a mortgage taken by Roggio on his home in Rumson, New Jersey.  On July 10, 2002, Roggio executed a note and mortgage (the

"Mortgage") to Anthony.  (Roggio 56.1 at ¶ 19; Emmanouil Resp. at ¶ 19: Doc. Nos. 154, 159.)  The Mortgage contained the following relevant terms: (1) Roggio was named as the "borrower"; (2) Anthony was named as the "lender"; (3) the Mortgage was for $850,000 and secured by Roggio's home at 140 Rumson Road, Rumson, New Jersey; (4) under the terms of the Mortgage, Roggio agreed that the full balance due on July 10, 2003, was $864,875.00.  (Emmanouil 56.1 at ¶¶ 40-47; Roggio Resp. at ¶¶ 40-47; Emmanouil Decl. Ex. 15: Doc. Nos. 153, 161.)  It was understood between Roggio, Anthony, and Zachary that the Mortgage would not be recorded until the $850,000 had been fully funded.  (Roggio 56.1 at ¶ 21; Emmanouil Resp. at ¶ 21: Doc. Nos. 154, 159.)  Roggio did not receive any funds on July 10, 2002.  (*Id.* at ¶ 21.)  Instead, Anthony facilitated the following transactions to fund the $850,000 Mortgage amount to Roggio: (1) on June 13, 2002, Anthony wired $32,000 to a Noved account; (2) on August 7, 2002, Anthony transferred $245,000 to the Noved account[5]; (3) on August 28, 2002, Anthony transferred $100,000 to the Noved account[6]; on September 25, 2002, Anthony transferred $130,000 to a Noved account.[7]  (Emmanouil 56.1 at ¶¶ 49, 51-58; Roggio Resp. at ¶¶ 49, 51-58:

---

[5] This $245,000 was acquired by Anthony via an August 5, 2002 loan from Sterling Bank in the amount of $245,000 that was secured by a Deed of Trust on the West Belt Property. (Emmanouil 56.1 at ¶¶ 51, 52; Roggio Resp. at ¶¶ 51, 52: Doc. Nos. 153, 161.)

[6] This $100,000 was acquired by Anthony via an August 21, 2002 loan from Sterling Bank in the amount of $100,000 that was secured by a Deed of Trust on the West Belt Property. (Emmanouil Decl. Ex. 23: Doc. No. 153.)

[7] This $130,000 was acquired by Anthony via a September 24, 2002 loan from Sterling Bank in the amount of $500,000 that was secured by a Deed of Trust on the West Belt Property. $350,000 of the $500,000 was used to pay off the two prior West Belt loans with Sterling Bank. It is undisputed that the proceeds of the aforementioned October 22, 2002 loan from Central Bank to West Belt in the amount of $750,000 was used in part to fully satisfy this $500,000 loan from Sterling Bank and relieve Anthony of his personal guarantee on that debt. (Roggio 56.1 at ¶ 26; Emmanouil Resp. at ¶ 26: Doc. Nos. 154, 159.)

Doc. Nos. 153, 161.) During his deposition, Roggio acknowledged that between June 13, 2002, and October, 2002, he received a total of $750,000, though he disputes that this entire amount came from Anthony. (*Id.* at ¶ 61.) Finally, Anthony asserts, and Roggio denies, that on October 2, 2002, Anthony transferred $100,000 to Jean Waklais, the mother of Roggio's personal trainer, after Roggio represented to Anthony that this transfer would be part of the Mortgage amount. (*Id.* at ¶¶ 62-64.) Based upon that assertion, Anthony claims that as of October 2, 2002, the full $850,000 contemplated in the Mortgage had been fully funded. (*Id.* at ¶ 68.) It is undisputed, however, that whatever amount of the Mortgage Anthony funded, Roggio: (1) never recorded the Mortgage; (2) did not make any of the quarterly payments pursuant to the Mortgage; (3) did not pay Anthony $864,875.00 on July 10, 2003. (*Id.* at ¶¶ 70-72.)

The third and final set of transactions relates to a series of cash transfers from Anthony to Roggio. Anthony asserts that he made the following cash transfers: (1) $40,000 to Noved on November 17, 2003; (2) $45,000 to Roggio on November 17, 2003; (3) $29,000 to Noved on November 17, 2003; (4) $121,250 to Noved on November 24, 2003[8]; (5) $8,700 to Noved on December 5, 2003; (6) $3,500 to Roggio on Decmeber 15, 2003; (7) $1,800 to Roggio on December 18, 2003; (8) $3,300 to Roggio on December 22, 2003. (*Id.* at ¶¶ 73-82.) While Roggio disputes several of these transfers, it is undisputed that Roggio received at least $244,200 from a joint account held by Zachary and Anthony. (Roggio 56.1 at ¶ 31; Emmanouil Resp. at ¶ 31: Doc. Nos. 154, 159.)

### B. Procedural History

---

[8] With regard to this transfer, it is undisputed that on November 21, 2003, Anthony received $121,250 for the sale of real property he owned in Northfield, New Jersey. (Emmanouil 56.1 at ¶¶ 77-78; Roggio Resp. at ¶¶ 77-78: Doc. Nos. 153, 161.)

Based generally upon the foregoing factual background, the Emmanouils filed their complaint against the Roggios on March 7, 2006. (Doc. No. 1.) Subsequently, on November 6, 2006, the Emmanouils filed an amended complaint that is their operative pleading in this case. The Emmanouils' amended complaint lodges the following thirteen counts against the Roggios: (1) breach of contract against Roggio (Mortgage) (Count I); (2) fraud against Roggio (Mortgage) (Count II); (3) conversion against Roggio and Noved (West Belt cash transfers) (Count III); (4) fraud against Roggio (subsequent cash transfers) (Count IV); (5) breach of the covenant of good faith and fair dealing against Roggio (Mortgage) (Count V); (6) breach of the covenant of good faith and fair dealing against Roggio and Noved (subsequent cash transfers) (Count VI); (7) breach of contract against Noved (West Belt cash transfers) (Count VII); (8) breach of fiduciary duty against Roggio and Noved (West Belt cash transfers) (Count VIII); (9) unjust enrichment against Roggio (Mortgage) (Count X); (10) unjust enrichment against Roggio (subsequent cash transfers) (Count X); (11) unjust enrichment against Jean Waklais (Count XI); (12) conversion against Roggio and Noved (Meineke Lease Purchase Agreement) (Count XII); and (13) specific performance against Roggio (Mortgage) (Count XIII). (Am. Compl; Doc. No. 33.) On June 15, 2009, the Roggios filed their present motion for summary judgment on all counts of the Emmanouils' amended complaint except Count XI, which is lodged against Jean Waklais.[9] (Roggio Summ. J. Br. at p. 1; Doc. No. 154-8.) The Emmanouils oppose the Roggios' present motion. (Emmanouil Opp'n Br.; Doc. No. 159.) Also on June 15, 2009, the Emmanouils moved

---

[9] Roggio also seeks summary judgment on Count VIII of his own complaint which lodges a claim for legal malpractice against Zachary's former law firm Concepcion, Rojas & Santos ("CRS"). That element of Roggio's present motion is moot, as this Court granted summary judgment in favor of CRS on March 12, 2010, and terminated CRS as a party to this case. (Doc. Nos. 219, 220.)

for summary judgment on their claims against the Roggios and Jean Waklais, which the Roggios oppose. (Emmanouil Summ. J. Br.; Doc. No. 153.)

On May 22, 2009, also based generally upon the foregoing factual background, Roggio filed his amended complaint against the Emmanouils that is Roggio's operative pleading in this case. (Doc. No. 139.) Roggio's amended complaint lodges the following seven counts against the Emmanouils: (1) breach of contract against Anthony (West Belt ownership) (Count I); (2) corporate mismanagement against Anthony (Count II); (3) breach of fiduciary duty against Anthony (Count III); (4) repayment of loan against West Belt (Count IV); (5) breach of the covenant of good faith and fair dealing against Anthony (Count V); (6) derivative claim for conversion and misappropriation of funds against Anthony, West Belt, and Eugenia Emmanouil (Count VI); and (7) fraud against Anthony (Count VII). On June 15, 2009, the Emmanouils filed their present summary judgment motion on all counts of Roggio's amended complaint. (Emmanouil Summ. J. Br.; Doc. No. 153.) Roggio opposes the Emmanouils' present motion. (Roggio Opp'n Br.; Doc. No. 161.)

## II.  DISCUSSION

### A.  Legal Standard

#### 1.  Summary Judgment

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hersh v. Allen Prods. Co., Inc.*, 789 F.2d 230, 232 (3d Cir. 1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably

be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987).

**2. Pleading Fraud Pursuant to Fed. R. Civ. P. 9(b)**

Federal Rule of Civil Procedure 9(b) requires a plaintiff to plead fraud with particularity sufficient to place the defendant on notice of the precise misconduct with which they are charged, and to protect defendants from spurious charges of fraudulent behavior. *See Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984), cert. denied, 469 U.S. 1211, 105 S. Ct. 1179, 84 L. Ed. 2d 327 (1985); see also Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity"). Therefore, pleading the fraud element, a plaintiff must specify "'the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). The Court of Appeals for the Third Circuit clarified that,

> [a]lthough Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud."

*In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002); *see also Lum v. Bank*

*of Am.*, 361 F.3d 217, 225 (3d Cir.) (citing *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 659 (3d Cir. 1998)), cert. denied, 543 U.S. 918 (2004).

**B. Application**

**1. The Roggios' Motion for Partial Summary Judgment**

The Roggios seek summary judgment on all counts of the Emmanouils' amended complaint except Count XI that lodges a claim of unjust enrichment against Jean Waklais. (Roggio Summ. J. Br. at p. 1; Doc. No. 154-8.) As the Court noted previously, there are three sets of transactions at issue in this case, and each of the Emmanouils' claims against Roggio and Noved focus on one set of transactions. Therefore, the Court will address the Emmanouils' claims against Roggio and Noved by transaction set.

First, in Counts I, II, V, IX, and XIII, the Emmanouils lodge various claims against Roggio that relate to the Mortgage. (Am. Compl.; Doc. No. 33.) Respectively, those claims are: (1) breach of contract against Roggio (Count I); (2) fraud against Roggio (Count II); (3) breach of the covenant of good faith and fair dealing against Roggio (Count V); (4) unjust enrichment against Roggio (Count X); and (5) specific performance against Roggio (Count XIII). (*Id.*) In their present motion, the Roggios seek summary judgment on each of these counts. The Roggios also argue that the Emmanouils' fraud claims fail under Fed. R. Civ. P. 9(b). The Court will deny the Roggios' motion as to each of these counts. Stated simply, making all inferences in favor of the Emmanouils, there are myriad genuine issues of material fact surrounding the Mortgage that preclude the Court's entry of summary judgment. Furthermore, the Roggios' argument that the Emmanouils' fraud claim is not pled with the specificity demanded by Fed. R. Civ. P. 9(b) is unavailing. The Court concludes that the Emmanouils' amended complaint

contains sufficiently detailed factual allegations to satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b). Therefore, the Roggios' motion with regard to the Emmanouils' Mortgage-based claims will be denied.

Second, in Counts III, VII, VIII, and XII, the Emmanouils lodge various claims against Roggio and Noved that relate to the West Belt cash transfers. (Am. Compl.; Doc. No. 33.) Respectively, those claims are: (1) conversion against Roggio and Noved (Count III); (2) breach of contract against Noved (Count VII); (3) breach of fiduciary duty against Roggio and Noved (Count VIII); and (4) conversion against Roggio and Noved (Meineke Lease Purchase Agreement) (Count XII). (*Id.*) Stated simply, making all inferences in favor of the Emmanouils, there are myriad genuine issues of material fact surrounding the West Belt cash transfers that preclude the Court's entry of summary judgment. As such, the Roggios' motion with regard to the Emmanouils' West Belt cash transfer-based claims will be denied.

Third, in Counts IV, VI, and X, the Emmanouils lodge various claims against Roggio and Noved that relate to the various subsequent cash transfers made by Anthony. (Am. Compl.; Doc. No. 33.) Respectively, those claims are: (1) fraud against Roggio (Count IV); (2) breach of the covenant of good faith and fair dealing against Roggio and Noved (Count VI); and (3) unjust enrichment against Roggio (Count X). (*Id.*) Stated simply, making all inferences in favor of the Emmanouils, there are myriad genuine issues of material fact surrounding the subsequent cash transfers made by Anthony that preclude the Court's entry of summary judgment. Furthermore, as above, the Roggios' argument that the Emmanouils' fraud claim is not pled with the specificity demanded by Fed. R. Civ. P. 9(b) is unavailing. The Court concludes that the Emmanouils' amended complaint contains sufficiently detailed factual allegations to satisfy the

heightened pleading requirements of Fed. R. Civ. P. 9(b). Therefore, the Roggios' motion with regard to the Emmanouils' claims based upon Anthony's subsequent cash transfers will be denied.

The Court will, however, grant the Roggios' motion for partial summary judgment in one respect: the Emmanouils' claims against Roggio's wife, Callie Lasch Roggio ("Callie"). In their motion brief, the Roggios correctly note that the Emmanouils have lodged no affirmative claims for relief against Callie. (Roggio Summ. J. Br. at p. 27; Doc. No. 154-8.) Indeed, a simple review of the Emmanouils' amended complaint reveals that none of the Emmanouils' thirteen counts name Callie. Therefore, the Emmanouils' argument in opposition is unavailing when viewed in light of their amended complaint. Because the Emmanouils have not stated a claim against Callie, the Court will grant the Roggios's motion for summary judgment regarding Callie, and will order her dismissed as a party to this case.

**2. The Emmanouils' Motion for Partial Summary Judgment**

The Emmanouils seek summary judgment on all counts of Roggio's amended complaint, except Count VIII that lodges a claim against CRS. (Emmanouil Summ. J. Br.; Doc. No. 153.) As noted above, the Court previously granted summary judgment in favor of CRS and dismissed CRS as a party to this case. (Doc. Nos. 219, 220.) All of Roggio's claims relate to actions allegedly taken by the Emmanouils' with respect to West Belt. Stated simply, making all inferences in favor of Roggio, there are myriad genuine issues of material fact surrounding all of the counts in Roggio's amended complaint that preclude the Court's entry of summary judgment. Further, given the facts in dispute, the Court does not conclude at this stage of litigation that any of Roggio's claims against the Emmanouils fail as a matter of law. Therefore, the Court cannot

grant summary judgment in favor the Emmanouils on Roggio's claims.

Additionally, the Emmanouils seek summary judgment against the Roggios on the claims in the Emmanouils' amended complaint. (Emmanouil Summ. J. Br.; Doc. No. 153.) Drawing all inferences in favor of the Roggios with regard to each of the Emmanouils' claims, there are myriad genuine issues of material fact that preclude the Court's entry of summary judgment. This is also true of the Emmanouils' claim of unjust enrichment against Jean Waklais in Count XI of the Emmanouils' amended complaint. The Court's review of the evidence presented – primarily Roggio's deposition – reveals that it is entirely unclear what became of the $100,000 allegedly paid by Anthony to Jean Waklais. As such, making all inferences in favor of Jean Waklais, the Court cannot grant summary judgment to the Emmanouils on Count XI of their amended complaint.

## III. CONCLUSION

For the foregoing reasons, the Court will DENY the Emmanouils' motion for partial summary judgment. (Doc. No. 153.) The Court will also DENY the Roggios' motion for partial summary judgment in all respects except regarding the Emmanouils' alleged claims against Callie Lasch Roggio. (Doc. No. 154.) The Court will GRANT summary judgment in favor of Callie Lasch Roggio and order her terminated as a party to this case. (*Id.*) An appropriate form of order accompanies this memorandum opinion.

Dated: March 29, 2010

/s/ Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.